AO 106A  (08/18)  Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

District of Columbia

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br>TWO DIGITAL DEVICES IN THE<br>CUSTODY OF THE METROPOLITAN<br>POLICE DEPARTMENT UNDER RULE 41 | )<br>)<br>)<br>)<br>)<br>)   Case No. 22-sw-346 |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachments A-1 and A-2, incorporated herein by reference.

located in the ___Jurisdiction of the___ District of _____Columbia_____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

❑ property designed for use, intended for use, or used in committing a crime;

❑ a person to be arrested or a person who is unlawfully restrained.

The search is related to violations of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841(a)(1) and 846,<br>18 U.S.C. § 924(c),<br>22 D.C. Code § 402 | Possession with Intent to Distribute Controlled Substances, Including Fentanyl, and<br>Conspiracy Thereof;  Possession and Use of a Firearm During a Drug Trafficking Offense;<br>Assault with a Dangerous Weapon |

The application is based on these facts:

See Attached Affidavit in support of Search Warrant, which is incorporated herein by reference.

❑ Continued on the attached sheet.

❑ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's  signature*

Caroline Miller, Investigator
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____telephone_____ *(specify reliable electronic means).*

Date: ___11/03/2022___

_____
*Judge's signature*

City and state: ___Washington, D.C.___

Moxila A. Upadhyaya, United States Magistrate Judge
_____
*Printed name and title*

AO 93C  (08/18)  Warrant by Telephone or Other Reliable Electronic Means    ❒ Original        ❒ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

District of Columbia

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>TWO DIGITAL DEVICES IN THE<br>CUSTODY OF THE METROPOLITAN<br>POLICE DEPARTMENT UNDER RULE 41 | )<br>)<br>)<br>)  Case No.  22-sw-346<br>)<br>)<br>) |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____Jurisdiction of the_____ District of _____Columbia_____
*(identify the person or describe the property to be searched and give its location)*:

See Attachments A-1 and A-2, incorporated herein by reference.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B, incorporated herein by reference.

**YOU ARE COMMANDED** to execute this warrant on or before _____November 17, 2022_____ *(not to exceed 14 days)*
❒ in the daytime 6:00 a.m. to 10:00 p.m.    ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____Moxila A. Upadhyaya_____ .
*(United States Magistrate Judge)*

❒ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
❒ for _____ days *(not to exceed 30)*    ❒ until, the facts justifying, the later specific date of _____ .

Date and time issued:      _____11/03/2022_____          _____
*Judge's signature*

City and state:      _____Washington, D.C._____          Moxila A. Upadhyaya, United States Magistrate Judge
*Printed name and title*

AO 93C  (08/18) Warrant by Telephone or Other Reliable Electronic Means (Page 2)

| **Return** | | |
|---|---|---|
| Case No.:<br> 22-sw-346 | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name(s) of any person(s) seized: | | |

| **Certification** |
|---|

      I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.


Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

## ATTACHMENT A-1

*Property to be searched*

The property to be searched is a blue Apple iPhone 13, bearing IMEI 352991733839470, seized on October 21, 2022 (hereinafter, "Device 1").  Device 1 is currently in the care and custody of the Metropolitan Police Department located at 2850 New York Avenue, Northeast, Washington, D.C. 20002.

1

**ATTACHMENT A-2**

*Property to be searched*

The property to be searched is a black Apple iPhone 11, bearing IMEI 351890928552719, which was seized on October 21, 2022 (hereinafter, "Device 2").  Device 2 is currently in the care and custody of the Metropolitan Police Department located at 2850 New York Avenue, Northeast, Washington, D.C. 20002.

**ATTACHMENT B**

*Property to be seized*

1.      The items, information, and data to be seized are fruits, evidence, information relating to, contraband, or instrumentalities, in whatever form and however stored, relating to violations of 21 U.S.C. §§ 841(a)(1) and 846 (Possession with Intent to Distribute Controlled Substances, Including Fentanyl, and Conspiracy Thereof), 18 U.S.C. § 924(c) (Possession and Use of a Firearm During a Drug Trafficking Offense), and 22 D.C. Code § 402 (Assault with a Dangerous Weapon) (hereinafter, the "TARGET OFFENSES") by DARNELL SAVOY, as described in the search warrant affidavit, including, but not limited to:

   a.   Evidence concerning SAVOY's unlawful possession of controlled substances, including but not limited to fentanyl, and evidence concerning the sourcing and distribution of controlled substances SAVOY has possessed;

   b.   Records and information related to ordering, purchasing, storage, transportation and sale of controlled substances and firearms, including U.S. currency used in their purchase and sale, bank and financial records, buyer lists, seller lists, and records of sales, customers, and suppliers;

   c.   Evidence of packaging materials, drug paraphernalia, and items used in the preparation, sale, transfer, transportation and packaging of illegal narcotics substances, and records, documents, electronic evidence, and other evidence of the

3

purchase, possession, distribution, or intended distribution of such controlled substances, or any conspiracy thereof;

d.   Evidence of the sourcing, distribution, possession, or ownership of firearms and firearms-related paraphernalia, such as magazines, converter switches, bulletproof vests, gun-cleaning kits, gun-sights, holsters, and other evidence of the purchase, possession or ownership of such weapons, ammunition, and associated items;

e.   Records and information, including photos, videos, and messages (in any form or sent through any app), relating to the obtainment, possession and/or sale of narcotics;

f.   Locational information, including navigations and searches, relating to SAVOY's whereabouts and/or activities relating to the location where narcotics are being stored, purchased, or sold;

g.   Records and information, including photos, videos, and messages (in any form or sent through any app) relating to property used in connection with commission of the TARGET OFFENSES;

h.   Communications between individuals concerning the TARGET OFFENSES;

i.   Evidence of the relationship between SAVOY and the victim, to include communications between them;

j.   Records and information, including photos, videos, and messages (in any form or sent through any app) relating to the means used to purchase narcotics;

4

k.  Records and information related to the identity or location of perpetrators, aiders and abettors, coconspirators, and accessories after the fact concerning the TARGET OFFENSES;

l.  Records and information, including photos, videos, and messages (in any form or sent through any app) related to the email addresses, phone numbers, and social media account identifiers used by perpetrators, aiders and abettors, coconspirators, and accessories after the fact concerning the TARGET OFFENSES;

m.  Records and information, including photos, videos, and messages (in any form or sent through any app) that constitute evidence of the states of mind of SAVOY and others with whom he is involved in trafficking drugs, possessing drugs, or committing associated crimes (e.g., conspiracy or acts of violence), *e.g.*, intent, absence of mistake, or evidence indicating preparation or planning, or knowledge and experience, related to the criminal activity under investigation;

n.  Records and information, including photos, videos, and messages (in any form or sent through any app) that constitute evidence concerning persons who either (i) collaborated, conspired, or assisted (knowingly or unknowingly) in the commission of the criminal activity under investigation; or (ii) communicated with SAVOY relating to the criminal activity under investigation, including records that help reveal their whereabouts;

5

o. Records and information, including photos, videos, and messages (in any form or sent through any app) about individual(s) or group(s) that may be having disputes with SAVOY and those with whom he is or has been engaged in criminal activity, as well as evidence of their relationship(s);

p. Address/phone books or contact information that reflects names of potential criminal associates;

q. Call logs for the period of October 11, 2022 to the present, and logs of any date concerning calls between SAVOY or the Devices and those with whom he is or has been engaged in criminal activity;

r. Evidence of who used, owned, or controlled the Devices at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, chat, instant messaging logs, photographs, and correspondence;

s. Evidence of software, or the lack thereof, that would allow others to control the Devices, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

t. Evidence of the attachment to the Devices of other storage devices or similar containers for electronic evidence;

u.  Evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the Devices;

v.  Evidence of the times the Devices were used;

w.  Passwords, encryption keys, and other access devices that may be necessary to access the Devices;

x.  Documentation and manuals that may be necessary to access the Devices or to conduct a forensic examination of the Devices;

y.  Records of or information about Internet Protocol addresses used by the Devices; and

z.  Records of or information about the Devices' Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

7

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF TWO DIGITAL DEVICES IN THE CUSTODY OF THE METROPOLITAN POLICE DEPARTMENT UNDER RULE 41 | SW No. 22-sw-346<br><br>UNDER SEAL |

**AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41**
**FOR A WARRANT TO SEARCH AND SEIZE**

I, Caroline Miller, first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.     I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—Device 1 and Device 2 (together, the "Devices"), both digital devices—which are currently in law enforcement's possession, as described in Attachments A-1 and A-2, and the extraction from that property of electronically stored information as described in Attachment B.

2.     I am an Investigator with the Washington, D.C. Metropolitan Police Department ("MPD"). I have been in this position since April 2017. I am currently assigned to the MPD Violent Crimes Suppression Division ("VCSD"), Violence Reduction Unit ("VRU"). My work has focused on narcotics- and gun-related investigations and has involved the execution of numerous search warrants pursuant to which narcotics and weapons have been seized. As an Investigator with the VRU, I am responsible for investigations involving unlawful activities that include firearm offenses, drug offenses, and violent crimes. As an MPD Investigator, I am authorized to execute warrants issued under the authority of the United States.

8

3.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other officers, agents, witnesses, and agencies.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant. It does not set forth all of my knowledge, or the knowledge of others, about this matter.

4.      Based on my training and experience and the facts as set forth in this affidavit, I respectfully submit that there is probable cause to believe that violations of 21 U.S.C. §§ 841(a)(1) and 846 (Possession with Intent to Distribute Controlled Substances, Including Fentanyl, and Conspiracy Thereof), 18 U.S.C. § 924(c) (Possession and Use of a Firearm During a Drug Trafficking Offense), and 22 D.C. Code §  402 (Assault with a Dangerous Weapon) (hereinafter, the "TARGET OFFENSES") have been committed by DARNELL SAVOY.  There is also probable cause to search the Devices, further described below and in Attachments A-1 and A-2, for the things described in Attachment B.

## **IDENTIFICATION OF THE DEVICES TO BE EXAMINED**

5.      The property to be searched is a blue Apple iPhone 13, bearing IMEI 352991733839470, denoted as Device 1, and a black Apple iPhone 11, bearing IMEI 351890928552719, denoted as Device 2.

6.      The Devices are currently in the care and custody of the Metropolitan Police Department located at 2850 New York Ave, NE, Washington, D.C. 20002.

**PROBABLE CAUSE**

7.      On October 11, 2022, at approximately 10:36 hours, MPD officers were dispatched to 303 53rd Street, NE Washington, D.C. for a stabbing. The area is within the Richardson Dwellings-D.C. Public Housing Authority neighborhood, more commonly referred to as Clay Terrace.  The 911 caller, W-1, advised that his grandson had just been stabbed in the arm by a black male with a grey hoodie by the name of "Darnell Savoy" also known as "Payne," who was last seen fleeing in a gray or white jeep.  The suspect was later identified, as described *infra*, as DARNELL SAVOY.

8.      When officers arrived on scene, they located the victim at 303 53rd Street, NE, suffering from a deep laceration to his left, upper arm. The victim was transported by DCFEMS to Howard University Hospital for treatment, which entailed receiving several internal and external stitches.  A MPD Detective responded to Howard Hospital to interview the victim. However, the victim advised that he did not wish to speak with police.

9.      The MPD Detective also responded to the scene and interviewed W-1, who stated that IT saw the victim and suspect involved in a fight, and during the fight, the suspect stabbed the victim.

10.      W-1 had previously described to the initial responding officers that the suspect was twenty-two years' old, short with a thick or stocky build, brown skin, short hair, and wearing a gray hoodie. W-1 reported that after the stabbing, the defendant entered a white or gray Jeep Compass and fled the scene. W-1 stated that IT knew the suspect as "Darnell" with a nickname of "Pain." According to W-1, IT has known "Darnell" for several years from living in the neighborhood.

10

11.     The MPD Detective queried MPD databases and located a "Darnell Lamont Savoy" a.k.a. "Major Payne or Payne" (PDID 651-611) with an accompanying photograph, depicted below.



12.     The MPD Detective showed W-1 the above confirmation photograph of SAVOY to W-1, and W-1 positively identified SAVOY, stating something to the effect of "that's him, that's [the] one who stabbed my baby, I hope you catch him." The identification procedure was captured on Officer B. Brown's body worn camera.

13.     On October 12, 2022, a MPD colleague obtained video footage of the assault from D.C. Housing Authority.  A summary of the events depicted in the surveillance is described below.

14.     Camera B3, located alongside 5227 Cloud Place, NE at 10:30:40 hours shows:   A white, mid-size SUV with a black roof drives westbound in the 5200 block of Cloud Place, NE towards 53rd Street, NE.



15.     Camera H2, located alongside 301 53rd Street, NE, at 10:30:50 Hours, shows:  The same white vehicle turning from the 5200 block of Cloud Place, NE. The vehicle appears to be a newer model Jeep Compass. The driver of the vehicle parks the vehicle in the middle of the street in front of 305 53rd Street, NE. The driver, who initially remains in the car, appears to briefly speak with W-1 as W-1 stands near the sidewalk.  At 10:31 hours, the victim is then observed exiting a residence located at 303 53rd Street, NE while wearing a pink-hued sweatshirt and gray sweatpants. The victim gestures towards the white Jeep and begins to walk towards it.  SAVOY (encircled below in red) exits the driver's seat of the vehicle while wearing a black jacket, black hoodie, and black pants. As soon as SAVOY exits the vehicle, he reaches with his right hand into the front of his waistband and retrieves an object resembling a firearm.



16.     SAVOY then hits the victim in the head with his left hand. A physical fight unfolds between the victim and SAVOY.  SAVOY places the object resembling a firearm back into the front of his waistband and pulls his shirt down to cover his waistband.  SAVOY then goes back to the driver's side of the Jeep and removes his outermost black jacket, placing it inside the vehicle through the front driver's-side window.  SAVOY appears to retrieve an item from his waistband and places it in the vehicle through the driver's-side window.

17.     SAVOY then reapproaches the victim while appearing unarmed. The two then reengage in a physical fight.  During the assault, W-1 and several witnesses attempt to intervene and separate SAVOY from the victim. During the fight, SAVOY's black sweatshirt is ultimately removed from his person, revealing a white tank top. SAVOY once again goes back to the white Jeep and opens the front driver's-side door.  SAVOY leans into the vehicle as if retrieving an object and then walks back towards the victim, who appears to be walking away from SAVOY.  SAVOY appears to be holding an object in his right hand while approaching the victim.  SAVOY (encircled

below in red) grabs the victim while making several stabbing motions towards the victim.



18.     Eventually, the victim falls to the ground in front of 303 53rd Street, NE.  SAVOY is observed standing over the victim and striking him multiple times, while the victim places his hands in front of his face. W-1 and the unknown witnesses separate the two with W-1 dragging SAVOY off of the victim.



19.     During the struggle, SAVOY drops an object that appears consistent with a weapon, which the victim ultimately picks up.  SAVOY walks back to the white Jeep Compass

14

and drives southbound in the 300 block of 53rd Street, NE at 10:33 hours. Your affiant notes that prior to picking up the object SAVOY had dropped, the victim appeared to be unarmed in the surveillance footage of the incident.

20.      While SAVOY flees the scene in his vehicle, the victim is observed throwing an object at the moving vehicle. It is believed that this object was the weapon that was used to stab the victim.

21.      On Friday, October 14, 2022, your affiant and a law enforcement partner responded to the 300 block of 53rd Street, NE in an effort to canvass for the thrown object. While canvassing, W-1 approached your affiant, stating that IT was in possession of the knife used in the assault, and that the victim had thrown it in anger as SAVOY fled. Consequently, your affiant recovered from W-1 a knife, depicted in the below image. W-1 also reported that, during the assault, individuals were yelling at SAVOY, "Don't shoot him".



22.      Later that same day, your affiant and a law enforcement partner returned to the 300 block of 53rd Street, NE to obtain an elimination buccal swab from W-1. During this second

encounter, W-1 reported that IT had observed SAVOY in possession of a firearm and IT believed that SAVOY did not shoot the victim because there were too many people outside at the time.

23.    Four days prior to the incident, on October 7, 2022, a MPD colleague and law enforcement partner were travelling in the 5300 block of Clay Terrace and observed a white Jeep Compass, bearing Missouri license plate "RH8L0M", that was parked alongside 5308 Clay Terrace.  It should be noted that the vehicle was parked in the direct vicinity of 303 53rd Street, NE.

24.    A WALES/NCIC check revealed that the vehicle was registered to "PV Holding Corp" with a listed address of 10482 Natural Bridge Saint Louis, MO 63134. A Subpoena was served on Avis Budget Group, requesting information for a white Jeep Compass that was currently being rented in the Washington, D.C. area.  An Avis Budget Group representative stated that the vehicle was a white 2021 Jeep Compass with a Missouri tag of RH8L0M and VIN of 3C4NJDCB6MT583450. The renter of the vehicle was listed as Crystian Lucky with a D.O.B. of 04/24/1994, and an address of 2841 Brentwood Drive, NE Washington, D.C. 20018, and phone number 202-644-1779. The rental agreement started on September 17, 2022, and the anticipated return date was listed as October 15, 2022.  Your affiant was advised by Avis on October 17, 2022, that the rental had not yet been returned. However, your affiant subsequently learned that the rental was returned to Avis Rental Car Company at Union Station during the afternoon hours of October 18, 2022, by an unknown male.

25.    A search on CashApp of 202-644-1779 revealed that this phone number is connected to a username of "$yunggpayne." A TLO query also revealed that this phone number is associated with a "Darnell Savoy."

16

26.     Your affiant is aware that SAVOY is under pretrial supervision for a pending Assault with Intent to Kill While Armed case in D.C. Superior Court (docket number 2019 CF1 003259). A report from Pre-Trial regarding the GPS tracks of SAVOY's ankle monitor include the following observations:

a)  On October 11, 2022, at 10:31 AM EDT the GPS location of Savoy's ankle monitor is at 300 53rd Street, NE.

b)  On October 11, 2022, at 10:32 AM EDT the GPS location of Savoy's ankle monitor is at 305 and 307 53rd Street, NE.

c)  On October 11, 2022, at 10:33 AM EDT the GPS location of Savoy's ankle monitor is at 305 53rd Street, NE.

d)  On October 11, 2022, at 10:34 AM EDT the GPS location of Savoy's ankle monitor is at 5300 Dix Street, NE.

It should be noted that the assault occurred in the 300 block of 53rd Street, NE, between 10:30 a.m. and 10:33 a.m.

27.     Your affiant obtained a report from Pre-Trial regarding the GPS tracks of the SAVOY's ankle monitor. The following observations were made:

a)  Between the day of the offense, October 11, 2022, and the morning of October 19, 2022, SAVOY's pretrial GPS monitor showed him in the 3900 block of Southern Ave, SE during the overnight hours for six of these eight nights. This includes multiple nights in a row. However, it should be noted that at some points during this time frame, the report provides a radius for SAVOY's location rather than a specific address. (*i.e.*, 3928-3922 Southern Ave SE). However, that radius includes the 3900 block of Southern Ave, SE. Further, your affiant also spoke with a Pretrial Services Officer who

17

provided information regarding SAVOY's GPS location points and this Officer reported that the GPS is most likely providing a small radius because SAVOY was inside of an apartment building at the time.

28.     On October 18, 2022, your affiant along with MPD colleagues conducted physical monitoring in the 3900 block of Southern Avenue, SE, Washington, D.C. in an effort to observe SAVOY exit an apartment building at 3924 Southern Avenue, SE. During this monitoring, a white Jeep compass bearing Missouri tags RH8L0M was observed parked in front of 3928 Southern Avenue, SE.

29.     At approximately 0802 hours MPD members observed SAVOY exiting the front door of 3924 Southern Avenue, SE.  He was clad in a black hooded sweatshirt, bright blue jacket, gray pants, and black boots. SAVOY then walked to the aforementioned white Jeep Compass, entered the driver's seat, and drove away in the vehicle. Prior to entering this vehicle, SAVOY was observed clutching his waistband.  It should be noted that 3924 Southern Avenue, SE is a multi-unit apartment consisting of six units.

30.     On October 19, 2022, your affiant along with MPD colleagues conducted physical monitoring inside and in front of 3924 Southern Avenue, SE to observe SAVOY exit an apartment. At approximately 0826 hours, SAVOY, clad in the same black hooded sweatshirt as well as a bright blue jacket, black pants and black boots exited 3924 Southern Avenue, SE Apartment #301.  The black hooded sweatshirt and black boots that MPD members witnessed SAVOY wearing on October 18 and 19, 2022, is consistent with the clothing he was wearing during the October 11, 2022 stabbing.

31.     Apartment #301 is on the left side of the third floor of the building.  MPD

members observed SAVOY exit the front door of 3924 Southern Avenue, SE and walk across the street to a black Hyundai Elantra with Maryland temporary tags, T1080325 (later determined to be registered to Shantise Smith, DOB:02/26/1992, with a listed address of 3924 Southern Avenue, SE).

32.     SAVOY unlocked the vehicle, opened the front door, and appeared to retrieve an object from the vehicle. SAVOY then walked back through the front door of 3924 Southern Avenue, SE and handed a set of keys to a female who was exiting Apartment #301. The female locked the door of Apartment #301 with a key and SAVOY and the female then left the apartment building together.  It should also be noted that a small child was present along with SAVOY and the female at the time.

33.     All three individuals then walked to the same black Hyundai Elantra with Maryland temporary tags T1080325.  SAVOY entered the driver's seat, and the female and child entered the front and back seats, respectively. SAVOY then drove the vehicle out of the parking spot and away from the 3900 block of Southern Ave SE.

34.     Your affiant obtained a photograph of Shantise Smith through a Linx query. MPD members who observed the female exit and lock the apartment with SAVOY confirmed that it was the same individual in the photograph that they saw.

35.     On October 20, 2022, an arrest warrant for Darnell Savoy, D.O.B. 05/28/1999, was signed by a D.C. Superior Court judicial officer for Assault with a Dangerous Weapon (Warrant Number 2022CRW3800). That same day, a D.C. Superior Court judicial officer also issued a search warrant for the premises of 3924 Southern Avenue, SE, Apartment #301, Washington, D.C. (Warrant Number 2022CSWSLD3801), where SAVOY was known to stay.

36.   On October 21, 2022, law enforcement executed D.C. Superior Court Search Warrant 22CSWSLD3801 at 3924 Southern Avenue, SE, Apartment #301.  During the search warrant execution, SAVOY, an adult female named Shantise Smith, and her three-year-old child were found inside of the location.  During the ensuing search, law enforcement recovered the following items:

a) One plastic bag containing an off-white powder substance weighing approximately 5.7 grams, located in the living room area alongside a blue camouflage Bass Pro Shop jacket. This plastic bag also contained a digital scale with white powder residue, a red cut straw with white powder residue, and a small zip with white powder residue. The off-white powder substance and the digital scale residue yielded a positive color reaction for the presence of fentanyl.

b) From the pockets of the blue Bass Pro Shop jacket (referenced above), which was located in the living room area, officers found:

   i. twenty-seven (27) assorted zip baggies containing an off-white powder substance, weighing approximately 9.4 grams (a portion of which field-tested positive for the presence of fentanyl);

   ii. twenty-nine (29) blue pills stamped "M30";

   iii. sixteen (16) red-colored zips recovered;

   iv. $473.00 in U.S. currency; and

   v. One pair of AirPods and a wallet containing Darnell Savoy's driver's license, Costco membership card, Visa card, and Capitol Access card.

c) A plastic bag with white powder residue and a pair of blue plastic gloves were recovered from a trash can in the kitchen.

d) A black semi-automatic Glock 30 handgun, bearing serial #BVEG130, was located on a stacked washer and dryer machine located in a hall closet. A high-capacity magazine was inserted into the magazine well of the firearm. The recovered firearm was loaded with one (1) round of ammunition in its chamber and twenty-three (23)

rounds of ammunition in its inserted magazine.

e) Black boots, a black hooded sweatshirt, and black pants were recovered from the living room area. An additional pair of black pants and a white tank top were recovered from bedroom two. This room appeared to belong to the three-year-old child present at the time of the execution of the search warrant. It should be noted that all clothing recovered appeared to belong to an adult male of SAVOY'S size, and while on scene, SAVOY confirmed that the tank top and black pants in the child's room were his.

37.     Also recovered during the execution of the residential search warrant were two iPhones (*i.e.*, the Devices described in Attachments A-1 and A-2) belonging to SAVOY. Both phones were recovered from bedroom one, where SAVOY was located at the time law enforcement entered the apartment. Both phones were on the windowsill directly on top of each other, as shown in the image below. The female occupant of the premises disclosed to a MPD colleague that both cell phones belonged to SAVOY.



38.     During the execution of the residential search warrant, SAVOY stated that he and the victim were "horseplaying", and SAVOY asked MPD members to call the victim to confirm as much. SAVOY directed MPD members to the blue iPhone (Device 1), located in bedroom

one, asking them to retrieve the victim's phone number from that iPhone to confirm SAVOY's description of the stabbing.

39.     Mail matter addressed to Shantise Smith at 2345 Iverson Street Temple Hills, MD 20748 and Antwann Carter #355125 at 1901 D Street, SE, Washington, D.C. 20003 were recovered from the living room couch inside the residence.

40.     The aforementioned recovered handgun appeared to be fully functional, designed to expel a projectile by the action of an explosive, with a barrel length of less than 12 inches, and capable of being fired with a single hand. Your affiant recovered the firearm and processed it for DNA and latent prints.  A MPD colleague reported that SAVOY (DOB: 05/28/1999) was queried through the D.C. gun registration, yielding negative results. Additionally, the serial number belonging to the recovered firearm was queried through WALES and the D.C. gun registration database, again yielding negative results.

41.     It should be noted that SAVOY was observed by MPD members wearing the same blue Bass Pro Shop jacket with a camouflage pattern and black boots while leaving 3924 Southern Avenue, SE on October 18, 2022, and October 19, 2022 (depicted below).  Specifically, on October 18, 2022, MPD colleagues observed SAVOY in Marvin Gaye park, within the area of 5300 Eads Street, NE a short time after departing 3924 Southern Avenue, SE.  They observed SAVOY change out of his blue-colored camouflage Bass Prop Shop jacket and into a black jacket while standing next to the same white Jeep Compass that was parked at the dead end leading to the park in the 5300 block of Eads Street, NE.  After SAVOY changed jackets, MPD members observed SAVOY enter the Marvin Gaye Park on foot, retrieve a small blue zip from the front of his person, and hand this zip to an unknown person.



42.     SAVOY was arrested on October 21, 2022, pursuant to D.C. Superior Court Arrest Warrant 22CRWSLD3800 for Assault with a Dangerous Weapon.  SAVOY was ultimately charged by Complaint in 2022 CF3 006296 with one count of Assault with a Dangerous Weapon – Knife (22 D.C. Code § 402), and in 2022 CF2 006297, SAVOY was charged by Complaint with one count of Unlawful Possession with Intent to Distribute a Controlled Substance While Armed (48 D.C. Code § 904.01(a)(1), 22 D.C. Code § 4502) and one count of Possession of a Firearm During a Crime of Violence or Dangerous Offense (22 D.C. Code § 4504(b)).  During his October 22, 2022 presentment, a D.C. Superior Court judicial officer ordered that SAVOY remain held without bond under 23 D.C. Code §§ 1322 (b)(1)(A) and (a)(1)(A).

43.     Based on my training, experience, and participation in firearms and narcotics investigations, and the training and experience of other law enforcement agents with whom I am working on this investigation, I know that:

a.      It is common for individuals engaged in the unlawful trafficking and possession of narcotics and firearms to use telephonic communications, both cellular (to include voice and text messages) and hard line, to further their criminal activities by coordinating the distribution of narcotics and firearms, illegal proceeds of such trafficking, and other efforts of co-conspirators.  It is also common for those individuals to utilize apps and social media accessible from their cellular devices, such as Instagram (in some cases, users are able to use apps to use social media platforms and services), to further their criminal activities;

b.      Individuals who engage in the unlawful trafficking and possession of narcotics and firearms use cellular telephones, apps, and social media (e.g., Instagram) to exchange information with customers and/or sources of supply through text messaging and direct messaging in addition to telephone conversations.  It is also common for firearms traffickers/possessors to send photographs and videos as an exchange of information with customers and/or source(s) of supply;

c.      Cellular telephones and social media accounts used by narcotics and firearms traffickers and possessors contain valuable information and evidence relating to their activities.  Such information consists of, but is not limited to: call logs, phone books, photographs, voicemail messages, text messages, direct messages, images and video, Global Positioning System data, and any other stored electronic data. This information can: (i) reflect the preparation for, arrangement of, and commission of the trafficking; (ii) identify locations where traffickers traveled to before and after transporting or selling contraband; (iii) reflect the ownership and use of the cellular telephones and firearms by the traffickers; (iv) document meetings and communications between traffickers, their customers, associates, and co-conspirators; (v) reflect communications

24

between traffickers and other individuals, discussing the trafficking and possession of firearms; (vi) reflect communications between traffickers and other individuals who may have assisted or provided support in the trafficking or possession of the narcotics and firearm(s); (vii) document or contain evidence of the obtaining, secreting, transfer, expenditure and/or the concealment of contraband relating to the trafficking; (viii) document or contain evidence of the purchase of items from the assets derived from the trafficking of contraband; and (ix) may include information about individuals or groups with whom the trafficker(s) have a dispute;  and

d.      Individuals involved in the unlawful trafficking and possession of narcotics and firearms often use cellphone cameras to take video recordings and photographs of themselves or other members of the organization engaging in illegal activities, such as the brandishing of firearms. Those photographs and videos are often posted on social media accounts such as Instagram, YouTube, or other platforms.

44.     Given the recovery of a significant quantity of suspected fentanyl combined with law enforcement's prior observation of SAVOY's involvement in a hand-to-hand transaction of suspected narcotics, and given the recovery of a firearm in the same location where narcotics were recovered inside SAVOY's jacket on October 21, 2022, it is reasonable to infer that SAVOY is engaged in narcotics trafficking while armed with a firearm, and, like many traffickers of such contraband, he uses his cellphones to facilitate such.  What's more, given that SAVOY directed law enforcement to access the victim's contact information from Device 1, it is also reasonable to infer that evidence of SAVOY's relationship and communications with the victim surrounding the October 11, 2022 stabbing are also contained therein.  There is therefore probable cause to believe that the Devices described in Attachments A-1 and A-2 contain evidence, fruits, contraband,

instrumentalities, and information on the TARGET OFFENSES, as described further in Attachment B.

## **TECHNICAL TERMS**

45.     Based on my training and experience, and information acquired from other law enforcement officials with technical expertise, I know the terms described below have the following meanings or characteristics:

      a.     "Digital device," as used herein, includes the following three terms and their respective definitions:

      1)     A "computer" means an electronic, magnetic, optical, or other high speed data processing device performing logical or storage functions and includes any data storage facility or communications facility directly related to or operating in conjunction with such device. *See* 18 U.S.C. § 1030(e)(1).  Computers are physical units of equipment that perform information processing using a binary system to represent information.  Computers include, but are not limited to, desktop and laptop computers, smartphones, tablets, smartwatches, and binary data processing units used in the operation of other products like automobiles.

      2)     "Digital storage media," as used herein, means any information storage device in which information is preserved in binary form and includes electrical, optical, and magnetic digital storage devices.  Examples of digital storage media include, but are not limited to, compact disks, digital versatile disks ("DVDs"), USB flash drives, flash memory cards, and internal and external hard drives.

      3)     "Computer hardware" means all equipment that can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic,

or similar computer impulses or data.  Computer hardware includes any data-processing devices (including, but not limited to, central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, floppy disk drives and diskettes, and other memory storage devices); peripheral input/output devices (including, but not limited to, keyboards, printers, video display monitors, modems, routers, scanners, and related communications devices such as cables and connections), as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including, but not limited to, physical keys and locks).

b.      "Wireless telephone" (or mobile telephone, or cellular telephone), a type of digital device, is a handheld wireless device used for voice and data communication at least in part through radio signals and also often through "wi-fi" networks.  When communicating via radio signals, these telephones send signals through networks of transmitters/receivers, enabling communication with other wireless telephones, traditional "land line" telephones, computers, and other digital devices.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of applications and capabilities. These include, variously: storing names and phone numbers in electronic "address books"; sending, receiving, and storing text messages, e-mail, and other forms of messaging; taking, sending, receiving, and storing still photographs and video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; utilizing global positioning system ("GPS") locating and tracking technology, and accessing and downloading information from the Internet.

c.      A "tablet" is a mobile computer, typically larger than a wireless phone yet smaller than a notebook, that is primarily operated by touch-screen.  Like wireless phones, tablets function as wireless communication devices and can be used to access the Internet or other wired or wireless devices through cellular networks, "wi-fi" networks, or otherwise.  Tablets typically contain programs called applications ("apps"), which, like programs on both wireless phones, as described above, and personal computers, perform many different functions and save data associated with those functions.

d.      A "GPS" navigation device, including certain wireless phones and tablets, uses the Global Positioning System (generally abbreviated "GPS") to display its current location, and often retains records of its historical locations.  Some GPS navigation devices can give a user driving or walking directions to another location and may contain records of the addresses or locations involved in such historical navigation.  The GPS consists of 24 NAVSTAR satellites orbiting the Earth.  Each satellite contains an extremely accurate clock.  Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers.  These signals are sent by radio, using specifications that are publicly available.  A GPS antenna on Earth can receive those signals.  When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e.      "Computer passwords and data security devices" means information or items designed to restrict access to or hide computer software, documentation, or data.  Data security devices may consist of hardware, software, or other programming code.  A password (a string of alpha-numeric characters) usually operates as a digital key to "unlock" particular data

security devices.   Data security hardware may include encryption devices, chips, and circuit boards.   Data security software of digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched.   Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the progress to restore it.

f.      "Computer software" means digital information which can be interpreted by a computer and any of its related components to direct the way they work.   Computer software is stored in electronic, magnetic, or other digital form.   It commonly includes programs to run operating systems, applications, and utilities.

g.      Internet Protocol ("IP") Address is a unique numeric address used by digital devices on the Internet.   An IP address, for present purposes, looks like a series of four numbers, each in the range 0-255, separated by periods (*e.g.*, 149.101.1.32).   Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination.   Most Internet service providers control a range of IP addresses.   Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

h.      The "Internet" is a global network of computers and other electronic devices that communicate with each other using numerous specified protocols.   Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

i.      "Internet Service Providers," or "ISPs," are entities that provide individuals and businesses access to the Internet.   ISPs provide a range of functions for their customers,

29

including access to the Internet, web hosting, e-mail, remote storage, and co-location of computers and other communications equipment. ISPs can offer a range of options in providing access to the Internet, including via telephone-based dial-up and broadband access via digital subscriber line ("DSL"), cable, dedicated circuits, fiber-optic, or satellite. ISPs typically charge a fee based upon the type of connection and volume of data, called bandwidth, which the connection supports. Many ISPs assign each subscriber an account name, a user name or screen name, an e-mail address, an e-mail mailbox, and a personal password selected by the subscriber. By using a modem, the subscriber can establish communication with an ISP and access the Internet by using his or her account name and password.

j.      A "modem" translates signals for physical transmission to and from the ISP, which then sends and receives the information to and from other computers connected to the Internet.

k.      A "router" often serves as a wireless Internet access point for a single or multiple devices and directs traffic between computers connected to a network (whether by wire or wirelessly). A router connected to the Internet collects traffic bound for the Internet from its client machines and sends out requests on their behalf. The router also distributes to the relevant client inbound traffic arriving from the Internet. A router usually retains logs for any devices using that router for Internet connectivity. Routers, in turn, are typically connected to a modem.

l.      "Domain Name" means the common, easy-to-remember names associated with an IP address. For example, a domain name of "www.usdoj.gov" refers to the IP address of 149.101.1.32. Domain names are typically strings of alphanumeric characters, with each level delimited by a period. Each level, read backwards – from right to left – further identifies parts of

an organization.  Examples of first-level, or top-level domains are typically .com for commercial organizations, .gov for the governmental organizations, .org for organizations, and .edu for educational organizations.  Second-level names will further identify the organization, for example usdoj.gov further identifies the United States governmental agency to be the Department of Justice. Additional levels may exist as needed until each machine is uniquely identifiable.  For example, www.usdoj.gov identifies the World Wide Web server located at the United States Department of Justice, which is part of the United States government.

m.      "Cache" means the text, image, and graphic files sent to and temporarily stored by a user's computer from a website accessed by the user in order to allow the user speedier access to and interaction with that website in the future.

n.      "Peer to Peer file sharing" (P2P) is a method of communication available to Internet users through the use of special software, which may be downloaded from the Internet. In general, P2P software allows a user to share files on a computer with other computer users running compatible P2P software.  A user may obtain files by opening the P2P software on the user's computer and searching for files that are currently being shared on the network.  A P2P file transfer is assisted by reference to the IP addresses of computers on the network:  an IP address identifies the location of each P2P computer and makes it possible for data to be transferred between computers.   One aspect of P2P file sharing is that multiple files may be downloaded at the same time.  Another aspect of P2P file sharing is that, when downloading a file, portions of that file may come from multiple other users on the network to facilitate faster downloading.

i.      When a user wishes to share a file, the user adds the file to shared library files (either by downloading a file from another user or by copying any file

31

into the shared directory), and the file's hash value is recorded by the P2P software. The hash value is independent of the file name; that is, any change in the name of the file will not change the hash value.

      ii.    Third party software is available to identify the IP address of a P2P computer that is sending a file.  Such software monitors and logs Internet and local network traffic.

      o.    "VPN" means a virtual private network.  A VPN extends a private network across public networks like the Internet.  It enables a host computer to send and receive data across shared or public networks as if they were an integral part of a private network with all the functionality, security, and management policies of the private network.  This is done by establishing a virtual point-to-point connection through the use of dedicated connections, encryption, or a combination of the two.  The VPN connection across the Internet is technically a wide area network (WAN) link between the sites.  From a user perspective, the extended network resources are accessed in the same way as resources available from a private network-hence the name "virtual private network."  The communication between two VPN endpoints is encrypted and usually cannot be intercepted by law enforcement.

      p.    "Encryption" is the process of encoding messages or information in such a way that eavesdroppers or hackers cannot read it but authorized parties can.  In an encryption scheme, the message or information, referred to as plaintext, is encrypted using an encryption algorithm, turning it into an unreadable ciphertext.  This is usually done with the use of an encryption key, which specifies how the message is to be encoded.  Any unintended party that can see the ciphertext should not be able to determine anything about the original message.  An

authorized party, however, is able to decode the ciphertext using a decryption algorithm that usually requires a secret decryption key, to which adversaries do not have access.

        q.     "Malware," short for malicious (or malevolent) software, is software used or programmed by attackers to disrupt computer operations, gather sensitive information, or gain access to private computer systems.  It can appear in the form of code, scripts, active content, and other software.  Malware is a general term used to refer to a variety of forms of hostile or intrusive software.

        34.     Based on my training, experience, and research, I know that the Devices have capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device, and sometimes by implication who did not, as well as evidence relating to the commission of the offense(s) under investigation.

**COMPUTERS, ELECTRONIC/MAGNETIC STORAGE, AND FORENSIC ANALYSIS**

        46.     As described above and in Attachment B, this application seeks permission to search for evidence, fruits, contraband, instrumentalities, and information that might be found within the Devices, in whatever form they are found.  Based on my knowledge, training, and experience, as well as information relayed to me by agents and others involved in this investigation and in the forensic examination of digital devices, I respectfully submit that there is probable cause to believe that the records and information described in Attachment B will be stored in the Devices for at least the following reasons:

a)      Individuals who engage in criminal activity, including distribution and possession with the intent to distribute controlled substances, possessing and trafficking firearms, possessing firearms in furtherance of drug trafficking, and conspiracy to commit the foregoing use digital devices, like the Devices, to communicate with co-conspirators about their activities and to maintain documents and records relating to their illegal activity, which can include logs of online chats with co-conspirators, email correspondence, text or other "Short Message Service" ("SMS") messages, contact information of co-conspirators, including telephone numbers, email addresses, identifiers for instant messaging and social medial accounts, as well as records of their illegal transactions and activities.

b)      Individuals who engage in the foregoing criminal activity, in the event that they change digital devices, will often "back up" or transfer files from their old digital devices to that of their new digital devices, so as not to lose data, including that described in the foregoing paragraph, which would be valuable in facilitating their criminal activity.

c)      Digital device files, or remnants of such files, can be recovered months or even many years after they have been downloaded onto the medium or device, deleted, or viewed via the Internet.  Electronic files downloaded to a digital device can be stored for years at little or no cost.  Even when such files have been deleted, they can be recovered months or years later using readily available forensics tools.  When a person "deletes" a file on a digital device such as a home computer, a smart phone, or a memory card, the data contained in the file does not actually disappear; rather, that data remains on the storage medium and within the device unless and until it is overwritten by new data.  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space – that is, in space on the digital device that is not allocated to an active

34

file or that is unused after a file has been allocated to a set block of storage space – for long periods of time before they are overwritten.  In addition, a digital device's operating system may also keep a record of deleted data in a "swap" or "recovery" file.  Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or "cache."  The browser typically maintains a fixed amount of electronic storage medium space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages.  Thus, the ability to retrieve "residue" of an electronic file from a digital device depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer, smart phone, or other digital device habits.

47.     As further described in Attachment B, this application seeks permission to locate not only electronic evidence or information that might serve as direct evidence of the crimes described in this affidavit, but also for forensic electronic evidence or information that establishes how the digital devices were used, the purpose of their use, who used them (or did not), and when.  Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I respectfully submit there is probable cause to believe that this forensic electronic evidence and information will be in any of the Devices at issue here because:

a)     Although some of the records called for by this warrant might be found in the form of user-generated documents or records (such as word processing, picture, movie, or texting files), digital devices can contain other forms of electronic evidence as well.  In particular, records of how a digital device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and

35

materials contained on the digital devices are, as described further in the attachments, called for by this warrant. Those records will not always be found in digital data that is neatly segregable from the hard drive, flash drive, memory card, or other electronic storage media image as a whole. Digital data stored in the Devices, not currently associated with any file, can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave digital data on a hard drive that show what tasks and processes on a digital device were recently used. Web browsers, e-mail programs, and chat programs often store configuration data on a hard drive, flash drive, memory card, or memory chip that can reveal information such as online nicknames and passwords. Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the times a computer, smart phone, or other digital device was in use. Computer, smart phone, and other digital device file systems can record data about the dates files were created and the sequence in which they were created. This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations. Recovery of this data requires specialized tools and a controlled laboratory environment and can also require substantial time.

b) Forensic evidence on a digital device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, registry information, configuration files, user profiles, e-mail, e-mail address books, chats, instant messaging logs, photographs, the presence or absence of malware, and correspondence (and the data associated

36

with the foregoing, such as file creation and last-accessed dates) may be evidence of who used or controlled the digital device at a relevant time, and potentially who did not.

      c)     A person with appropriate familiarity with how a digital device works can, after examining this forensic evidence in its proper context, draw conclusions about how such digital devices were used, the purpose of their use, who used them, and when.

      d)     The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a digital device that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, digital device evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on digital devices is evidence may depend on other information stored on the devices and the application of knowledge about how the devices behave. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

      e)     Further, in finding evidence of how a digital device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on the device. For example, the presence or absence of counter-forensic programs, anti-virus programs (and associated data), and malware may be relevant to establishing the user's intent and the identity of the user.

      f)     I know that when an individual uses a digital device to further drug trafficking activity, or weapons possession or weapons trafficking, the individual's device will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The digital device is an instrumentality of the crime because it is used

as a means of committing the criminal offense.  The digital device is also likely to be a storage medium for evidence of crime.  From my training and experience, I believe that a digital device used to commit a crime of this type may contain data that is evidence of how the digital device was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense and the identities of those perpetrating it.

## METHODS TO BE USED TO SEARCH DIGITAL DEVICES

48.     Based on my knowledge, training, and experience, as well as information relayed to me by agents and others involved in this investigation and in the forensic examination of digital devices, I know that:

a)     Searching digital devices can be an extremely technical process, often requiring specific expertise, specialized equipment, and substantial amounts of time, in part because there are so many types of digital devices and software programs in use today.  Digital devices – whether, for example, desktop computers, mobile devices, or portable storage devices – may be customized with a vast array of software applications, each generating a particular form of information or records and each often requiring unique forensic tools, techniques, and expertise. As a result, it may be necessary to consult with specially trained personnel who have specific expertise in the types of digital devices, operating systems, or software applications that are being searched, and to obtain specialized hardware and software solutions to meet the needs of a particular forensic analysis.

b)     Digital data is particularly vulnerable to inadvertent or intentional modification or destruction.  Searching digital devices can require the use of precise, scientific

38

procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted, or password-protected data.  Recovery of "residue" of electronic files from digital devices also requires specialized tools and often substantial time.  As a result, a controlled environment, such as a law enforcement laboratory or similar facility, is often essential to conducting a complete and accurate analysis of data stored on digital devices.

c)      Further, as discussed above, evidence of how a digital device has been used, the purposes for which it has been used, and who has used it, may be reflected in the absence of particular data on a digital device.  For example, to rebut a claim that the owner of a digital device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the digital device remotely is not present on the digital device.  Evidence of the absence of particular data or software on a digital device is not segregable from the digital device itself. Analysis of the digital device as a whole to demonstrate the absence of particular data or software requires specialized tools and a controlled laboratory environment and can require substantial time.

d)      Digital device users can attempt to conceal data within digital devices through a number of methods, including the use of innocuous or misleading filenames and extensions.  For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear as though the file contains text.  Digital device users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form.   Digital device users may encode communications or files, including substituting innocuous terms for incriminating terms or deliberately misspelling words, thereby

thwarting "keyword" search techniques and necessitating continuous modification of keyword terms.  Moreover, certain file formats, like portable document format ("PDF"), do not lend themselves to keyword searches.  Some applications for computers, smart phones, and other digital devices, do not store data as searchable text; rather, the data is saved in a proprietary non-text format.  Documents printed by a computer, even if the document was never saved to the hard drive, are recoverable by forensic examiners but not discoverable by keyword searches because the printed document is stored by the computer as a graphic image and not as text.  In addition, digital device users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography."  For example, by using steganography, a digital device user can conceal text in an image file that cannot be viewed when the image file is opened.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  A substantial amount of time is necessary to extract and sort through data that is concealed, encrypted, or subject to booby traps, to determine whether it is evidence, contraband, or instrumentalities of a crime.

e)      Analyzing the contents of mobile devices, including tablets, can be very labor intensive and also requires special technical skills, equipment, and software.  The large, and ever increasing, number and variety of available mobile device applications generate unique forms of data, in different formats, and user information, all of which present formidable and sometimes novel forensic challenges to investigators that cannot be anticipated before examination of the device.  Additionally, most smart phones and other mobile devices require passwords for access. For example, even older iPhone 4 models, running IOS 7, deployed a type of sophisticated encryption known as "AES-256 encryption" to secure and encrypt the operating system and

application data, which could only be bypassed with a numeric passcode. Newer cell phones employ equally sophisticated encryption along with alpha-numeric passcodes, rendering most smart phones inaccessible without highly sophisticated forensic tools and techniques, or assistance from the phone manufacturer. Mobile devices used by individuals engaged in criminal activity are often further protected and encrypted by one or more third party applications, of which there are many. For example, one such mobile application, "Hide It Pro," disguises itself as an audio application, allows users to hide pictures and documents, and offers the same sophisticated AES-256 encryption for all data stored within the database in the mobile device.

f)      Based on all of the foregoing, I respectfully submit that searching any digital device for the information, records, or evidence pursuant to this warrant may require a wide array of electronic data analysis techniques and may take weeks or months to complete. Any pre-defined search protocol would only inevitably result in over- or under-inclusive searches, and misdirected time and effort, as forensic examiners encounter technological and user-created challenges, content, and software applications that cannot be anticipated in advance of the forensic examination of the devices. In light of these difficulties, your affiant requests permission to use whatever data analysis techniques reasonably appear to be necessary to locate and retrieve digital information, records, or evidence within the scope of this warrant.

49.    In searching for information, records, or evidence, further described in Attachment B, law enforcement personnel executing this search warrant will employ the following procedures:

a)      The digital devices, and/or any digital images thereof created by law enforcement, sometimes with the aid of a technical expert, in an appropriate setting, in aid of the

41

examination and review, will be examined and reviewed in order to extract and seize the information, records, or evidence described in Attachment B.

b)    The analysis of the contents of the digital devices may entail any or all of various forensic techniques as circumstances warrant.  Such techniques may include, but shall not be limited to, surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files); conducting a file-by-file review by "opening," reviewing, or reading the images or first few "pages" of such files in order to determine their precise contents; "scanning" storage areas to discover and possibly recover recently deleted data; scanning storage areas for deliberately hidden files; and performing electronic "keyword" searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are related to the subject matter of the investigation.

c)    In searching the digital devices, the forensic examiners may examine as much of the contents of the digital devices as deemed necessary to make a determination as to whether the contents fall within the items to be seized as set forth in Attachment B.  In addition, the forensic examiners may search for and attempt to recover "deleted," "hidden," or encrypted data to determine whether the contents fall within the items to be seized as described in Attachment B. Any search techniques or protocols used in searching the contents of the Devices will be specifically chosen to identify the specific items to be seized under this warrant.

## AUTHORIZATION TO SEARCH AT ANY TIME OF THE DAY OR NIGHT

50.    Because forensic examiners will be conducting their search of the digital devices in a law enforcement setting over a potentially prolonged period of time, I respectfully submit that

good cause has been shown, and therefore request authority, to conduct the search at any time of the day or night.

## **CONCLUSION**

51.     I submit that this affidavit supports probable cause for a warrant to search the Devices described in Attachments A-1 and A-2 and to seize the items described in Attachment B.

Respectfully submitted,

_____
Caroline Miller
Investigator
Metropolitan Police Department

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on November 3, 2022.

_____
HONORABLE MOXILA A. UPADHYAYA
UNITED STATES MAGISTRATE JUDGE